UNITED STATED BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Honorable Howard R. Tallman

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| RONALD DUANE GOLLEHON, | ) | Case No. 10-28933 HRT |
| | ) | Chapter 7 |
| Debtor. | ) | |
| ————————————————— | ) | |
| | ) | |
| FLORADO PARTNERS LLC, | ) | Adversary No. 11-01298 HRT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RONALD DUANE GOLLEHON, | ) | |
| | ) | |
| Defendant. | ) | |
| ————————————————— | ) | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

THIS MATTER came before the Court for trial on the Plaintiff's Complaint.  Following a three-day evidentiary hearing held September 30-October 2, 2013, and the submission of written closing arguments (docket ##165, 167, 168), the Court took the matter under advisement.  The Court is now prepared to rule, and hereby finds and concludes as follows.

## BACKGROUND

The Defendant, Debtor Ronald Duane Gollehon ("Gollehon"), is a real estate broker and developer and an entrepreneur.  When Gollehon was starting his real estate development career, his mentor advised him to set up a new entity for each real estate project, in order to protect the assets of the other entities.  Gollehon followed this advice, setting up dozens of LLCs over the course of his over 30 year career.  Accompanying his bankruptcy petition was a list of 36 entities formed between 2000 and 2010, some of which are discussed in more detail below.

### Summerlin Equities

Gollehon and his family members – his wife, Kimberly Gollehon, and his two adult children, Elliot Gollehon and Kevin Gollehon – set up separate entities to own their business interests and other personal property.  Beginning in 2001, Summerlin Equities, LLC, served as Gollehon's family's holding company.  Gollehon testified that he served as manager of Summerlin Equities but did not own any interest in it.  Gollehon further testified that Summerlin Equities owned any membership interests he had in other LLCs.  Gollehon did not produce any

documentation reflecting the ownership of, or assets owned by, Summerlin Equities. He did produce Summerlin Equities Quickbooks records of checking accounts, with bank reconciliations.

### Saddleback Hills Development

In the early 2000's Gollehon worked with others to form and manage several entities in connection with the development of a 1900 lot master plan community in Firestone, Colorado. Such entities included Saddleback Hills Lake & Conservancy I, II, and III, and Saddleback Hills Development, Inc. Gollehon did not produce any documentation reflecting the ownership of, or assets owned by, Saddleback Hills Lake & Conservancy I, II, and III, or Saddleback Hills Development, Inc, but he has represented that the Saddleback Hills development was foreclosed upon in 2009.

### Pitkin County Projects

Also in the early 2000's, Gollehon worked with others to form and manage several entities in connection with real estate projects in Aspen and surrounding Pitkin County, Colorado, including The Reserve at Smuggler Mountain LLC, Smuggler Mountain Partners LLC, and Smuggler Ridge Associates LLC. Gollehon did not produce any documentation reflecting the ownership of, or assets owned by, The Reserve at Smuggler Mountain LLC, Smuggler Mountain Partners LLC, or Smuggler Ridge Associates LLC. One of the Pitkin County projects included the purchase of an option on a 36-acre parcel of land on Smuggler Mountain, known as the Flanigan Parcel. Gollehon testified that the option on the Flanigan Parcel was originally owned by an entity known as Starr Summerlin Properties, which later became Summerlin Properties, LLC, which was owned by Summerlin Equities, LLC. Gollehon did not produce any documentation to support this testimony.

### Romanians

In 2002, Gollehon worked with Romanian citizens Cosmin Danila and Ionela Boriceanu (together, as referred to by the parties, the "Romanians"), to form CI Consulting, Inc., a Colorado Corporation ("CI Colorado"). Gollehon testified that the Romanians owned CI Colorado, and Gollehon acted as President. Gollehon did not produce any documentation reflecting the ownership of, or assets owned by, CI Colorado. Florado obtained bank records from Chase Bank showing that Gollehon opened an account in CI Colorado's name in September 2002, and that Elliot Gollehon was added as an authorized signer in July 2006, by authorization of a resolution signed by Kimberly Gollehon.

In June 2003, Gollehon assisted the Romanians with opening a TD Ameritrade Account ("TD Account") for CI Consulting, Inc., an Anguillan corporation ("CI Anguilla"). The Romanians provided written authority for Gollehon to trade and wire funds to and from the TD

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

Account.  Also during 2003, an account was opened in the Romanians' names at Chase Bank
(the "Romanian Account").  The Romanians provided Gollehon with pre-signed blank checks
and a debit card in the name of Cosmin Danila, which Gollehon used to withdraw cash at ATMs,
including one located near his home in Littleton, Colorado.

**Florado**

In the summer of 2004, Gollehon and two other individuals, Kenneth Cahill and David
Curtis Lundberg, formed Florado Partners, LLC ("Florado"), the Plaintiff in this adversary
proceeding.  The parties agreed to combine certain of their and their related companies' interests
in various real estate projects, including the Saddleback Hills development, into Florado.
Florado itself participated in real estate development projects, including a development in
Arkansas (through Florado ARK, LLC) and a liquor store on Santa Fe Drive in Littleton,
Colorado.

Gollehon served as managing principal and handled Florado's day-to-day financial
management until he was removed by resolution passed on January 4, 2005.  On January 6,
2005, the majority members of Florado, individually and in the name of Florado, filed a
complaint against Gollehon in Denver (Colorado) District Court, Case No. 05CV137 (the
"Florado Lawsuit"), alleging that Gollehon breached his fiduciary duties and committed fraud in
exercising his duties as managing principal of Florado.

**Summerlin Trust**

On or about January 1, 2005, Gollehon authorized formation of The Summerlin Trust,
with Gollehon as the sole settlor.  The beneficiaries of the trust are Kimberly Gollehon (80%),
Kevin Gollehon (10%), and Elliot Gollehon (10%).

The Trust Agreement, which Gollehon produced and which was admitted as Defendant's
Exhibit D, included an attachment providing as follows:

> Ronald D. Gollehon, Settlor, conveys his entire ownership interest as a Member
> of Summerlin Equities LLC to The Summerlin Trust.  The Summerlin Trust
> agrees to pay Ronald D. Gollehon the $490.00 which is his entire monies in the
> Capital Account of Summerlin Equities LLC.
>
> CI Consulting, Inc., a Colorado corporation, conveys its entire ownership interest
> as a Member of Summerlin Equities LLC to The Summerlin Trust.  The
> Summerlin Trust agrees to pay CI Consulting, Inc. the $490.00 which is its entire
> monies in the Capital Account of Summerlin Equities LLC.

Gollehon executed the attachment individually and as President of CI Consulting, Inc.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

**BransonWood**

In late 2004 and early 2005, Gollehon worked with others to form and manage several entities in connection with real estate development projects in Marion County, Arkansas, near the Missouri border. Such entities included BransonWood Resort LLC (which later became Sugar Loaf Resort LLC), BransonWood Land LLC, BransonWood Development LLC, BransonWood Golf LLC, and Sugar Loaf Land LLC. Gollehon testified that the planned development, known as Branson Wood or Sugar Loaf, was not completed because of the downturn in the economy. Gollehon further testified that he dissolved all of the BransonWood entities except BransonWood Land.

Gollehon testified that BransonWood Land was owned 85% by the Summerlin Trust, 5% by Gene Upshaw, 5% by Kenny Rogers, and 5% by Linda Chapman, and that Gollehon was the sole manager. Gollehon did not produce any documentation reflecting the ownership of, or assets owned by, any of the BransonWood entities.

**Fognani Lawsuit**

During the early 2000's, and in particular while Gollehon was working on the Saddleback Hills and Pitkin County development projects, his attorney was John Fognani, now of the law firm of Fognani & Faught, PLLC ("Fognani"). In 2006, Fognani filed a lawsuit in Denver (Colorado) District Court, case number 2006CV9990 (the "Fognani Lawsuit"), against Gollehon and several entities with which Gollehon was involved, including The Reserve at Smuggler Mountain, LLC, Summerlin Equities, LLC and Smuggler Mountain Partners, LLC, to collect unpaid attorney fees. Gollehon filed a counterclaim against Fognani, asserting malpractice. Gollehon and his related entities were represented in the Fognani Lawsuit by Robert Tibbals.

**Grupo Summerlin**

In 2006, Gollehon formed Grupo Summerlin SA de CV ("Grupo Summerlin"), a Mexican entity in the business of developing real estate in Mazatlan, Mexico. Gollehon served as Grupo Summerlin's managing director. Grupo Summerlin initially purchased one spec home on Isla Mazatlan, then purchased seven more spec homes and raised money to construct and develop two condominium buildings. Gollehon testified that by 2007, about $3,000,000.00 had been invested in Grupo Summerlin, which funds were spent purchasing real estate and entertaining potential investors/purchasers, but Gollehon did not produce any documentary evidence showing the amount of funds raised or the way the funds were spent. Gollehon testified that he learned that the developer/contractor hired for the construction, Manuel Cristerna, was double or triple selling the homes Grupo Summerlin was developing. Gollehon testified that he attempted to pursue Mr. Cristerna but eventually had to abandon both legal recourse and the Mazatlan project when Gollehon received death threats, forcing him to leave Mexico in late March of 2009.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

Grupo Summerlin had a Mexican bank account at HSBC Bank (the "HSBC Account"), for which Gollehon was an authorized signer.  Gollehon testified that in September 2009, Grupo Summerlin's administrative employee in Mexico, whom Gollehon referred to as Anna Smith, took the remaining approximately $60,000 out of the HSBC Account and closed the account. The parties' pretrial statement (docket #145) includes in the statement of undisputed facts that the HSBC Account was open on Gollehon's petition date.  Gollehon testified that this was not correct.

Gollehon provided a Spanish-language document evidencing Grupo Summerlin's organization in Mexico, and indicating that Grupo Summerlin was owned 25% by Cosmin Danila, 25% by Ionela Boriceanu, 25% by Kimberly Gollehon and 25% by Gollehon.  Gollehon did not produce any documentation of the assets owned by Grupo Summerlin.  Nor did Gollehon produce any bank records for the HSBC Account.  He testified that he lost many records when he was forced to flee the country, and following his return to the United States, he was financially unable to obtain copies of the HSBC Account records.

**2006 Aspen real estate commissions**

During August 2006, Gollehon brokered the sale of certain real property in Aspen, Colorado and was entitled to receive an $840,000 real estate commission.  Gollehon testified that he assigned this commission to CI Anguilla, but he did not provide any documentation of the assignment or further detail regarding the consideration for the assignment.  Gollehon instructed Land Title to wire the commission to the TD Account, and the bank records of the TD Account show that the $840,000 wire transfer was received on August 21, 2006.  The bank records show that a $280,000 check was written to Kimberly Gollehon, which she deposited into her personal account on August 23, 2006.  The memo of the check was marked "loan," but Gollehon was unable to provide further details of the loan or any documentation reflecting the loan.  The bank records further show that the remaining amounts were transferred to CI Colorado, by several wire transfers made during 2006 and 2007.

In November 2006, Gollehon or Summerlin Realty, Inc. became entitled to a commission in the amount of $296,000.  Gollehon sent an e-mail instructing Land Title to pay 1/3 of the commission ($98,667) to Jack Kaufman as a referral fee, and to pay the balance of the commission ($197,333) to CI Colorado, by wire transfer.  The bank records of CI Colorado show that two wire transfers totaling $197,333 were received on November 16 and 17, 2006, and that a series of wire transfers were subsequently made to the HSBC Account.

**Delfin Property**

During the summer and fall of 2006, Gollehon became involved with negotiating an option to purchase certain real property located in Mexico referred to as "the Delfin

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

Property." Gollehon testified he originally owned the option for the Delfin Property, but he assigned the option to either CI Colorado or Grupo Summerlin. Gollehon did not produce any documentary evidence of the assignment of the option, other than a faxed counter offer with Gollehon signing under a Power of Attorney for The Summerlin Trust as Buyer. The $125,000 deposit for the option was tendered by CI Colorado.

Subsequently, a dispute arose between Michael D. Foley and his company, MDF Holdings, and Gollehon regarding the option and the parties' rights and interests in the Delfin Property. During April 2007, Foley, MDF Holdings, and Gollehon executed a Settlement Agreement and Mutual Release to resolve the Delfin Property dispute. The agreement proposed to pay $400,000 to Gollehon or his assigns. On April 19, 2007, KKG Consulting, LLC, Kimberly Gollehon's company, received the $400,000 settlement payment. Gollehon testified that the settlement should have been paid to Grupo Summerlin, but Foley's accountant would not let him wire the money to a Mexican corporation or bank account. KKG Consulting, LLC immediately transferred $300,000 to CI Colorado, with a $200,000 check marked with the notation "Repay Loan," and a $100,00 check marked with the notation "Loan." When asked what happened to the money received from Foley, Gollehon testified he thought the money ended up in Mexico in the HSBC Account.

### Early 2008 Transfers

On March 17, 2008, TurnHere, Inc., of Emeryville, California, sent a $5,000 check made payable to Ron Gollehon, addressed to him at C.I. Consulting, Inc. Gollehon endorsed and deposited the check into CI Colorado's Chase account. Gollehon was unable to recall why he received the payment.

Gollehon received a series of $600 monthly payments from the probate estate of his father, the Robert L. Gollehon Testamentary Trust ("Father's Estate"). On March 11, 2008, his Father's Estate sent Gollehon a $15,833.33 check. Gollehon endorsed the check to KKG Consulting, LLC.

### Arbitration Findings in Florado Lawsuit

The Florado Lawsuit was submitted to arbitration, and on March 22, 2008, the arbitrator entered his Findings of Fact, Conclusions of Law, Ruling and Award (the "Arbitration Findings"). In the Arbitration Findings, the arbitrator set forth the parties' history and Florado's operations and listed 31 separate corporate entities, some of which are noted above and listed on Gollehon's bankruptcy petition. The arbitrator found that the relationships among the entities, the projects in which they were involved, and the various individuals and entities holding an ownership interest in them was rarely reflected in any records or minutes, and that the operation of various corporate and partnership entities controlled by Gollehon, including Florado, was

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

simply done for convenience, using funds that were available in one to pay an obligation due from another without any regard to any corporate, management or ownership formalities.

The parties had asked the arbitrator to determine what interests or property Florado did or did not own. The arbitrator declined to do so, noting that the membership interests remained as established by the parties – Gollehon 34%[1], Cahill 30%, Lundberg 30% and David K. Lundberg 6% – and the parties could pursue further proceedings as needed to settle Florado's affairs. The Arbitration Findings held that Florado was entitled to recover the sum of $509,304.77, plus attorney's fees, from Gollehon. The Denver District Court entered judgment confirming the award on June 30, 2009.

### Transfer from Smuggler Result to Summerlin Equities

On April 25, 2008, Summerlin Equities received a wire transfer in the amount of $58,520 from an account at Wells Fargo owned by Smuggler Result LLC. Gollehon testified that Summerlin Equities owned a tract of land on Smuggler Mountain, which was purchased by Paul Zakovich and others, resulting in Summerlin Equities' owning an interest in Smuggler Result. Gollehon testified that when Smuggler Result was paid as a result of a conservation easement, Summerlin Equities became entitled to the $58,520 payment. Gollehon did not produce any documents to support his testimony.

The deposit from Smuggler Result LLC was the only substantial deposit made to the Summerlin Equities account between April 2008 and November 2008. The funds were disbursed as set forth on the attached Exhibit A, with checks written by both Gollehon and Kimberly Gollehon. One of the checks written in late April, for $19,779.00 to Boulder Motors, was for the purchase of a Mercedes that was driven by Kimberly Gollehon or Elliot Gollehon. In an email to Kimberly Gollehon dated April 30, 2008, Gollehon stated that the check was a "loan to The Summerlin Trust (we might change this to Elliot or Kevin)." Gollehon did not provide any further details or documentation of the loan(s).

Other payments were made to Ionela Boriceanu (6 checks, each with the notation "Consulting," totaling $19,000), Robert Tibbals (7 checks totaling $16,090), Time Insurance Company (6 electronic withdrawals totaling $3,520.33), and Kevin Gollehon (3 checks, each with the notation "Contract work," totaling $1,000). Gollehon did not provide any further

---

[1] At trial, Gollehon testified that his 34% interest in Florado was owned by Summerlin Equities. Although the Arbitration Findings could give the impression that the ownership was in Gollehon's individual name, a point Gollehon urged to this Court on a motion to dismiss, the Court finds it more likely that the arbitrator used the term "Gollehon" as shorthand, to refer to Gollehon and his related entities, rather than as a specific legal finding or conclusion that Gollehon's ownership was in his individual name.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

details or documentation of any consulting agreement with, or consulting services provided by, Ionela Boriceanu, or contract work done by Kevin Gollehon.

### Summerlin Energy

Gollehon formed Summerlin Energy, LLC ("Summerlin Energy") on July 16, 2009. Gollehon testified that he formed Summerlin Energy because he and his family needed to get into a different business after the real estate market collapsed in 2008 and 2009. In the pretrial statement of undisputed facts, the parties stated that Gollehon was the sole manager of Summerlin Energy, but at trial, Gollehon testified that Elliot Gollehon was a co-manager. Gollehon testified that Elliot and Kevin Gollehon each owned 50% of Summerlin Energy. Gollehon did not produce any documentation reflecting the ownership of, or assets owned by, Summerlin Energy.

On July 16, 2009, the same day that Summerlin Energy was formed, Gollehon opened a bank account for it at Chase (the "Summerlin Energy Account"), and immediately deposited a check in the amount of $21,666.57, dated June 16, 2009, from Mid Continent Energy. Gollehon explained that the payment was a result of a royalty transaction, but he did not provide any further detail or any documents explaining how Summerlin Energy earned a royalty payment a month before it was formed.

The larger deposits into, and withdrawals from, the Summerlin Energy Account are set forth on the attached Exhibit B. Prior to April 20, 2010, Gollehon wrote and signed all checks, but Gollehon removed himself as an account signer shortly after Fognani served Rule 69 interrogatories on him. After April 20, 2010, checks were written by Gollehon but signed by Elliot Gollehon.

The Summerlin Energy Account bank records show that in August and September of 2009, two deposits totaling $16,000 were made from checks drawn on the Romanian Account. Each check was marked "Loan." From October 2009 to July 2010, Gollehon, and later Elliot Gollehon, wrote 7 checks to Ionela Boriceanu, totaling $18,500.00. Each check was marked "Consulting." From February 2010 to July 2010, Gollehon, and later Elliot Gollehon, also wrote 5 checks to Cosmin Danila, totaling $16,000.00. Each check was marked "Consulting." Checks were also written to Gollehon (1 check for $2,000, marked "Loan"), to Kimberly Gollehon (1 check for $20,000, marked "Loan"), and to Elliot Gollehon (1 check for $3,000, marked "Loan"). Gollehon did not provide any further detail of the loans with, or consulting services provided by, Ionela Boriceanu or Cosmin Danila. Regarding the loans to Gollehon and his family members, Gollehon did not provide any detail as to repayment terms or amount outstanding. He testified that no loan documents were prepared, and that the parties intended to apply a minimal interest rate, as required to satisfy applicable IRS regulations.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

In January 2009, Gollehon wrote a $10,000 check to Paul Zakovich, marked "Loan." Gollehon did not provide any further detail or documentation of this loan. In November 2009 and January 2010, Gollehon wrote two checks to Paul Zakovich, totaling $1,100, which Gollehon testified were payments for property in Manzanillo, Mexico. No documents were produced to support the payments. In January 2010, Gollehon wrote a $439.89 check to Pueblo Bonito Emerald Bay, which Gollehon testified was a timeshare in Mexico owned by Kimberly Gollehon.

In January 2010, Gollehon wrote a $3,000 check to Norb Kmoch, with the notation "Loan." Gollehon testified that the loan may have been repaid in part by a $1,500.00 check made out to Mr. Kmoch, who endorsed it to Gollehon, who endorsed it to Ionela Boriceanu and deposited it into the Romanian Account. Gollehon did not provide any further details or documentation of the loan to Mr. Kmoch.

The Summerlin Energy Account records further show payments to Xcel Energy, Comcast, and Columbine Country Club, for utilities provided to the home where Gollehon lived; payments for life insurance on Gollehon's life; payments for a storage unit; and payments for lawn care and sprinkler service for the home where Gollehon lived. Gollehon testified that because the various entities used an office located in his home, the entities paid the utilities, cable, and water bills. The bank records also show several ATM withdrawals made at casinos in Black Hawk, Colorado and Las Vegas, Nevada; and several payments to Bellco Credit Union for a car loan on a 2003 Lexus SUV titled in Kimberly Gollehon's name and driven at times by Gollehon, which payments Gollehon testified were loans to Kimberly Gollehon.

From May to August 2010, Gollehon deposited 3 checks totaling $7,562.15, from an account identified as the Sugar Loaf Account. Each check was marked "Loan." Gollehon did not provide any further details, such as the balance owed or applicable interest rate, or any documentation of the loan(s) from Sugar Loaf.

Finally, in August of 2010, Gollehon made a series of four $500 cash deposits, totaling $2,000. Each deposit corresponds to a $500 ATM withdrawal made from the Romanian Account on the same date. Three of the four deposit slips are marked "from Summerlin Trust." At that time, The Summerlin Trust did not have an open bank account.

**Fognani Lawsuit Settlement**

On or about September 15, 2009, Gollehon, individually, and on behalf of Summerlin Equities, The Reserve at Smuggler Mountain, LLC, and Smuggler Mountain Partners, LLC (the "Settling Entities"), executed a Stipulated Settlement Agreement in Principle that resolved the Fognani Lawsuit as well as outstanding issues related to the transfer of Gollehon's entities' interest in the Flanigan Parcel to one of Fognani's other clients. The Settlement Agreement included the following provisions:

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

- Fognani would pay $75,000 to the Summerlin Trust.[2]
- Gollehon and the Settling Entities would assign to Fognani all rights they retained to the Flanigan Parcel.
- Gollehon and the Settling Entities would execute a confession of judgment in favor of Fognani in the amount of $600,000 plus interest.

On November 20, 2009, Fognani tendered a $75,000 cashier's check to The Summerlin Trust.  On November 23, 2009, The Summerlin Trust deposited the $75,000 check into its bank account, and then, on November 30, 2009, wired $74,000 to the Summerlin Energy Account.  Gollehon testified that the transfer to Summerlin Energy was a loan, but he did not provide any further details, such as the balance owed or applicable interest rate, or any documentation of the loan.  The Summerlin Energy Account records show one check, in the amount of $250.00, written to The Summerlin Trust, with the notation "Interest payment on loan."  The further distribution of the funds from the Summerlin Energy Account is set forth above and on the attached Exhibit B.

**BransonWood/Sugar Loaf Reinstatement**

On May 10, 2010, Gollehon filed papers with the Colorado Secretary of State to reinstate Sugar Loaf Resort, LLC ("Sugar Loaf"), which was formerly known as BransonWood Resort.  On that same date, Gollehon opened a Chase bank account for Sugar Loaf, with Gollehon as the sole signer.  Gollehon immediately deposited two checks from the United States Treasury, totaling $7,562.15, into the Sugar Loaf Account.  Both checks identified Gollehon as a member of Sugar Loaf.  The two checks were the only funds deposited into the Sugar Loaf Account.

On May 13, 2010, Gollehon deposited a check drawn on the Sugar Loaf Account for $6,500 with the notation "Loan" into the Summerlin Energy Account.[3]  On July 16, 2010, Gollehon drew a check for $500 on the Sugar Loaf Account and deposited the check into the Summerlin Energy Account.  On the date Gollehon filed his bankruptcy case, July 28, 2010, the Sugar Loaf Account retained a balance of $562.15.  On August 1, 2010, Gollehon drew a check

---

[2]  Gollehon testified that this payment was the remaining amount due to his related entities, based on the $150,000 deposit paid for the option on the Flanigan Parcel.  A $75,000 payment had previously been made pursuant to a Global Agreement dated April 11, 2006, between Gollehon or his entities, on the one hand, and one of Fognani's other clients, on the other.  The Global Agreement was referenced in exhibits before the Court but was not, itself, before the Court.

[3]  On that same date, Gollehon drafted, and Elliot Gollehon signed, a $5,000 check drawn on the Summerlin Energy Account, made payable to Cosmin Danila for "Consulting," and deposited into the Romanian Account.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

for $562.15 on the Sugar Loaf Account and deposited the funds into the Summerlin Energy Account.  Gollehon did not provide any further details, such as the balance owed or applicable interest rate, or any documentation of loans between Sugar Loaf and Summerlin Energy.

**Social Gaming Entities**

In 2010 Gollehon worked with his son and others to form and manage several entities in connection with the development of social gaming projects, including Game Working LLC and Game Working Management LLC.  In July 2010, Gollehon formed WikiRainForest, Inc., to develop a Farmville-type of game that would take place in the rain forest, with some of the proceeds to be shared with nonprofits.  After publicity surrounding the activities of WikiLeaks caused negative connotations for the name WikiRainForest, Gollehon formed a new company, Open Source Games, to continue to the work of WikiRainForest.  Gollehon did not produce any documentation reflecting the ownership of, or assets owned by, Game Working LLC, Game Working Management LLC, WikiRainForest, Inc., or Open Source Games.

Gollehon raised funds for WikiRainForest by soliciting investors to purchase shares of stock.  On July 20, 2010, Gollehon opened a Chase bank account for WikiRainForest (the "WikiRainForest Account"), with an initial deposit of $12,110 received from investors. Gollehon was the sole signer on the WikiRainForest Account.

On July 22, 2010, Gollehon wrote a $10,000 counter check from the WikiRainForest Account to Cosmin Danila and deposited the check into the Romanian Account.  Gollehon testified that the payment was a retainer for Cosmin Danila's services as a photographer for a future photo shoot in the Amazon.  Gollehon provided no documents to corroborate his testimony.  No photo shoot took place.  The funds in the Romanian Account were disbursed as set forth on Exhibit C, discussed below.

On July 23, 2010, Gollehon wired $775 from the WikiRainForest Account to Marion County Abstract for payment of real estate taxes on property owned by BransonWood Land, LLC in Arkansas.  Gollehon testified that the payment was necessary to maintain ownership of the approximately 60 lots owned by BransonWood Land, that BransonWood Land did not have the money to pay the taxes, and that he was planning on using the lots as additional collateral for the Game Working entities.  Gollehon further testified that he had attempted to sell the lots, but had been unable to do so.[4]

---

[4]  In May 2011, one of the lots owned by BransonWood Land sold for a $3,000.00 profit. Gollehon was unable to recall what happened to the sale proceeds, but he believed that they were paid to Kimberly Gollehon as repayment on a loan she had made to BransonWood Land.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

On the date that Gollehon filed his bankruptcy petition, July 28, 2010, the WikiRainForest Account had a balance of $4,310.  In August, Gollehon made 4 deposits, totaling $10,310, from investors' funds.  He wrote 3 checks, totaling $8,000: one for $3,000 to Kimberly Gollehon, marked "Consulting," posting August 11, 2010; one for $3,000 to Cosmin Danila, marked "Consulting," posting August 16, 2010; and one for $2,000 to Kimberly Gollehon, marked "Consulting," posting August 24, 2010.  Gollehon also made debit card purchases totaling $2,082.04 at various gas stations, office supply stores, and bars and restaurants in and around Denver.  Gollehon testified that all the charges were business expenses.

**2009 and 2010 Transfers to and from the Romanian Account**

The deposits into and withdrawals from the Romanian Account in 2009 and 2010 are set forth on the attached Exhibit C.  During that time period, the main sources of funds deposited into the account were the following:

- Grupo Summerlin, with 5 wire transfers from the HSBC Account totaling $50,427.40 deposited between March 23, 2009, and August 25, 2009;
- Summerlin Energy, with 12 checks totaling $34,500.00 deposited between October 29, 2009, and July 16, 2010, each of which was marked "Consulting";
- WikiRainForest, with 2 checks totaling $13,000.00 deposited between July 22, 2010 and August 16, 2010, one of which (for $10,000) Gollehon testified was a retainer for photography services to be provided by Cosmin Danila on a future trip to the Amazon, and the other of which (for $3,000) was marked "Consulting";
- Gollehon's individual account, with 7 checks totaling $9,650.00 deposited between January 15, 2009, and March 3, 2010, with 2 of those checks marked "repay loan";
- Kimberly Gollehon's individual account, with 3 checks totaling $7,000.00 deposited between September 29, 2009, and August 16, 2010, one of which was marked "loan," and one of which was marked "int"; and
- Gollehon's Father's Estate, with 4 checks totaling $3,577.43 deposited between June 3, 2009, and June 23, 2010.  Each check was made out to Gollehon, individually, who then endorsed it for deposit into the Romanian Account.

The bank account records show only a handful of withdrawals by check.  One check, posting July 15, 2009, was written to Elliot Gollehon, for $7,280.00, and was marked "Loan."  One check, posting September 15, 2009, was written to Kimberly Gollehon, for $1,000.00, and was marked "Loan."  One check, posting September 11, 2009, was written to Summerlin

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

Energy, for $6,000.00, and was marked "Loan." And finally, one check, posting July 26, 2010, was written to WikiRainForest, for $3,000.00, and was marked "1 Founder Unit."[5]

The bank account records show that most of the withdrawals from the account were online payments made to various credit card companies, with $86,462.61 in payments made between January 16, 2009, and September 15, 2010. Gollehon testified that the payments were reimbursement of business expenses charged to the various cards, which were used by Gollehon and members of his family. Of the credit card records received into evidence, most of the charges were incurred at bars and restaurants in Denver and Littleton, Colorado. Gollehon was questioned about those charges at trial and testified that they were business expenses because he was conducting business there.

The final method of withdrawal from the Romanian Account was by an ATM card in Cosmin Danila's name, which Gollehon testified that he carried and used to withdraw cash from the account. Approximately $942 was withdrawn at ATMs in Mazatlan, Mexico, in January and February of 2009; $10,200 was withdrawn at an ATM in Littleton, Colorado, near Gollehon's home, between April 2009 and September 2010; $300 in Black Hawk, Colorado; $500 in Las Vegas; and $750 in Edmonton, Alberta.

With the possible exception of the funds withdrawn from an ATM in Alberta, where Gollehon testified that the Romanians were living, it does not appear that any of the funds deposited into the Romanian Account were actually received by the Romanians. To the extent that deposits were labeled as payments for consulting, which almost all of them were, there was no evidence of any agreement to provide consulting services, or of any consulting services provided. To the extent that the deposits or checks were labeled as loans, there was no evidence of the amount of the loans made, applicable interest rates, or any repayment terms.

**Amendment to the Summerlin Trust**

On August 4, 2010, David Etter, Trustee of The Summerlin Trust, executed an Amendment #2 to the Summerlin Trust (the "Trust Amendment"). In the Trust Amendment, the Trustee noted his appointment, replacing the prior trustee. The Trustee also recognized the addition of certain assets to the trust, since the trust's inception, listed as follows:

    a.      Assignment by Summerlin Equities, LLC to the Summerlin Trust, all of
            Summerlin Equities LLC ownership in Florado ARK LLC, a Colorado
            limited liability company.

---

[5] The $3,000 check to WikiRainForest was written four days after WikiRainForest issued a $10,000 check to Cosmin Danila, which Gollehon testified was a retainer for photography services to be rendered.

Page 13 of 24

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

    b.    85% member of Bransonwood Land LLC, a Colorado limited liability company.

    c.    Settlor, Ronald D. Gollehon's assignment of his 25% ownership of the stock in Grupo Summerlin S.A. de C.V., a Mexican corporation.

    d.    Settlor Ronald D. Gollehon's assignment of any ownership interest in any and all Colorado limited liability companies which he may have received an ownership interest as the Manager.

    e.    A 12.5% undivided interest in Vista Azul, Manzanillo, Mexico, the corporate entity managed by Paul Zakovich, 5460 South Quebec St., #300, Greenwood Village, CO 80111.

    f.    100% member of Summerlin Technologies LLC, a Colorado limited liability company

    g.    100,000 shares of WikiRainForest, Inc., a Colorado corporation.

    h.    20% ownership of GameWorking LLC, a Colorado limited liability company.

Although the Trust Amendment was dated after Gollehon filed his bankruptcy petition, Gollehon asserts that no assets were conveyed post-petition and that, with the exception of the 12.5% interest in Vista Azul, none of the assets have any value.[6]

## DISCUSSION

    Florado's Complaint seeks denial of Gollehon's discharge under five subsections of 11 U.S.C. § 727. The Court will discuss each subsection in turn. But, as an initial matter, the Court will discuss Gollehon's credibility as a witness.[7]

    The Court had the opportunity to observe Gollehon during his testimony and finds him to have been inconsistent, evasive, and lacking credibility. His testimony was not supported by documentary evidence. To the extent that documentary evidence was available, it often contradicted Gollehon's testimony. Gollehon even disagreed with the "undisputed facts" submitted to this Court prior to trial, which facts were prepared with the assistance of Gollehon's counsel. The Court has therefore given little weight to Gollehon's explanation of his

---

    [6] Gollehon also testified that he never personally owned the 12.5% interest in Vista Azul; instead, he stated, the Summerlin Trust purchased it from Brian Hosp in March of 2010, and only the Summerlin Trust or Elliot Gollehon made quarterly payments on the real estate interest. The Summerlin Energy Account bank records belie Gollehon's testimony, as quarterly payments were made from that account in November 2009 and January 2010.

    [7] The Court is aware that the arbitrator in the Florado Lawsuit found Gollehon's testimony to lack credibility. The Court does not rely on the arbitrator's assessment, but instead makes its own determination in this respect.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

financial transactions, particularly in instances in which the explanation was vague, self-serving, and/or unsupported by any documentary evidence.

### A.      11 U.S.C. § 727(a)(2)(A)

To prevail on its § 727(a)(2)(A) count, Florado must show four elements by a preponderance of the evidence:  (1) Gollehon transferred, removed, concealed, destroyed, or mutilated, (2) property of his estate, (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor.  *Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008).

Florado has identified five transfers of Gollehon's personal funds to the Romanian Account, which transfers were made within a year prior to Gollehon's bankruptcy filing:

- October 2009, a $600 check from Gollehon's Father's Estate to Gollehon;
- March 2010, a $2,500 check from Gollehon's individual account;
- May 2010, a $1,500 check from Norbert Kmoch to Gollehon;
- May 2010, $1,000 cash Gollehon received from Norbert Kmoch; and
- June 2010, a $1,777.43 check from Gollehon's Father's Estate to Gollehon.

Gollehon does not dispute that the above-listed transfers (the "Personal Transfers"), which total $7,377.43, were transfers of Gollehon's property, within the definition of property of his bankruptcy estate.[8]  As to the Personal Transfers, the first three elements of the test are satisfied, and the only remaining dispute is whether Gollehon made the transfers with the intent to hinder, delay, or defraud a creditor.

Because rare is the occasion when a party lays bare his subjective intent, "[f]raudulent intent . . . may be established by circumstantial evidence, or by inferences drawn from a course of conduct."  *Farmers Coop. Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982).  Courts have set forth a number of circumstances relevant to the determination of fraudulent intent under § 727(a)(2)(A), including the following:

> 1) the lack or inadequacy of consideration; 2) the family, friendship or close associate relationship between the parties; 3) the retention of possession, benefit or use of the property in question; 4) the financial condition of the party sought to be charged both before and after the transaction in question; 5) the existence of a pattern or series of transactions after the onset of financial difficulties, or pendency or threat of suits by creditors; and 6) the general chronology of the events and transactions under inquiry.

---

[8]  *See* Defendant Ronald D. Gollehon's Written Closing Argument (dkt #167), at 16.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

*Aweida v. Cooper (In re Cooper)*, 150 B.R. 462, 465 (D. Colo. 1992).

Here, each factor favors the conclusion that in making the Personal Transfers, Gollehon acted with fraudulent intent. First, the transfers were made without consideration. Although Gollehon testified that the transfers were made to repay loans, Gollehon was unable to provide any details of any such loans. Given the lack of documentation of any amounts loaned or owed, and the overall lack of credibility of Gollehon's testimony, the Court cannot find that any such loans existed. The Court finds it more likely that checks were marked "loans" in an attempt to minimize tax and other implications of the receipt of income or assets.

Second, there was admittedly a close personal relationship between Gollehon and the Romanians.

Third, Gollehon retained the use and benefit of the funds transferred. He transferred the funds to other entities he controlled, for no apparent consideration; he made cash withdrawals from the account using an ATM card in Cosmin Danila's name; and he used the funds in the account to pay personal credit card expenses he and his family members incurred.[9]

Fourth, Gollehon's financial condition, both before and after the transfers, was poor. He had few personal assets and substantial personal liabilities.

Fifth, Gollehon's transfers were part of a pattern of transferring his personal funds to other accounts, including the Romanian Account, and transferring funds, including those purportedly owned by the Romanians or other Gollehon-controlled entities, to his and his family members' personal accounts or to accounts of other entities he controlled, without any documentation and without any apparent, legitimate business reason.

Finally, Gollehon's pattern of transferring funds among various accounts was ongoing for some period of time, at a time when creditors including Florado and Fognani had not only threatened, but by 2005 (Florado) and 2006 (Fognani) had actually filed, lawsuits against Gollehon. For example, in 2006 Gollehon, personally, earned substantial real estate commissions, but he did not deposit any of the commission payments into his personal account.

---

[9]   Although Gollehon testified that the expenses paid were all business expenses, he did not provide any further details of the type of business transacted or the persons with whom he was transacting business. The absence of such detail supports a finding that the expenses were not legitimate business expenses. *See generally* 26 U.S.C. § 274 (detailing requirements for allowance of entertainment expenses as business expenses, for taxation purposes). Further, as noted above, the Court did not find Gollehon to be a credible witness. As Gollehon's testimony regarding the business nature of the expenses was unsupported by any documentary evidence, the Court will not accept it.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

Instead, he deposited the payments into accounts in the name of CI Anguilla or CI Colorado, and then further transferred the funds from those accounts to Kimberly Gollehon or to Grupo Summerlin.  In the absence of a forensic accounting report, the Court cannot determine the final distribution of the funds, but the Court notes that further transfers were made to and from accounts in the names of Kimberly Gollehon, Grupo Summerlin, the Romanian Account, and various other Gollehon-controlled entities or Gollehon family members.

Considering all the evidence before the Court, the Court finds that Gollehon acted with fraudulent intent when he made the Personal Transfers.  Florado has satisfied each element of § 727(a)(2)(A) with respect to the Personal Transfers.[10]  The Court will therefore enter judgment on this count in favor of Florado, denying Gollehon's discharge under § 727(a)(2)(A).

### B.      11 U.S.C. § 727(a)(3)

To prevail on its § 727(a)(3) count, Florado must show by a preponderance of the evidence that Gollehon "failed to maintain and preserve adequate records and that the failure made it impossible to ascertain his financial condition and material business transactions." *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1295 (10th Cir. 1997).  Section 727(a)(3) does not require a debtor to provide perfect or even complete records.  "Records need not be so complete that they state in detail all or substantially all of the transactions taking place in the course of the business.  It is enough if they sufficiently identify the transactions that intelligent inquiry can be made respecting them."  *Hedges v. Bushnell*, 106 F.2d 979, 982 (10th Cir. 1939).  In general, a higher standard of recordkeeping will be required, as a prerequisite to discharge, of Chapter 7 debtors who are sophisticated business persons.  *In re Luby*, 438 B.R. 817, 832 (Bankr. E.D. Pa. 2010).  Considerations that are relevant in evaluating the adequacy of a debtor's records include the debtor's occupation, financial structure, education, experience, and sophistication, as well as any other circumstances that should be considered in interest of justice.  *In re Strbac*, 235 B.R. 880, 882 (6th Cir. BAP 1999).

---

[10]  Florado has argued that the Court should consider other transfers as well, including the $75,000 payment from Fognani to The Summerlin Trust, $74,000 of which was transferred to Summerlin Energy.  Unlike the Personal Transfers, which the evidence shows (and which Gollehon admitted) were made with funds that would have been property of Gollehon's bankruptcy estate, the additional transfers were made with funds that were in the name of other corporate entities, friends, or family members.  In the absence of a specific determination to disregard the corporate form of the various entities Gollehon managed, or to consolidate Gollehon's assets with those of related entities, friends, or family members, either of which is beyond the limited scope of the matter before this Court, the Court cannot find that the transferred funds were property of Gollehon's estate.  The Court will therefore limit its consideration to the Personal Transfers.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

Florado focuses on the documents that Gollehon destroyed, such as the credit card statements that he routinely shredded, or the documents that Gollehon failed to obtain from banks or credit card companies. The Court does not find that shredding credit card statements or failing to obtain copies of bank or credit card statements from the banks or credit card companies is sufficient to support denial of discharge under § 727(a)(3). And, although Florado argues that Gollehon failed to produce documents within his control, this does not appear to be a case in which specific records were created and maintained for a period of time, then lost, either here in Colorado or in Mexico, or destroyed on the eve of discovery. Instead, it is much more likely that specific records were never created in the first place.

With respect to the separate entities Gollehon chose to create, there was little to no evidence of the ownership of, or the assets owned by, any of the entities. To the extent that Gollehon testified regarding entity or asset ownership, his testimony was inconsistent and contradicted documentary evidence. For example, Gollehon testified that he never had an ownership interest in his family holding company, Summerlin Equities. But the trust agreement of The Summerlin Trust states that Gollehon conveyed his membership interest in Summerlin Equities, and the $490 in his capital account, to The Summerlin Trust. Gollehon also testified that he never owned any interest the BransonWood entities, but in May 2010 the IRS sent him a refund check based on his membership interest in Sugar Loaf. The Court cannot determine whether, to what extent, or during what time period Gollehon owned any interest in the entities he controlled or their assets.

With respect to the many bank accounts for which Gollehon was a signer, Gollehon transferred funds to and from various accounts without documenting the business purpose of the transfers, because in most cases there was no apparent, legitimate business purpose for the transfers. In some cases, funds were transferred in and out of various accounts on the same day, with some transfers designated as loans, and some designated as loan repayments, with no other documentation supporting a conclusion that any loans were actually made.

Gollehon is a sophisticated businessman with a college education and over 30 years of business experience. He chose to create numerous separate entities and to engage in business with foreign citizens and in foreign countries as part of a complex financial structure. A considerable amount of money exchanged hands whenever he did a business deal, with checks and wire transfers in the thousands or tens of thousands of dollars that Gollehon handled on behalf of himself, his entities, his family members and their entities, and the Romanians and their entities. The complexity of his financial structure and the amount of money involved requires detailed recordkeeping, including, at a minimum, the ownership interests of each entity, the assets owned by each entity, and the liabilities of each entity, including any accounting liabilities for loans received from or made to other individuals or entities. But in this case, Gollehon failed to create or maintain such records. He testified that Kimberly Gollehon acted as his bookkeeper. Gollehon did not call Kimberly Gollehon as a witness to support his testimony, but the Court finds that even if Kimberly Gollehon did act as Gollehon's bookkeeper, the

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

ultimate responsibility for the failure to create or maintain adequate records must fall on
Gollehon himself.

In the absence of any documentation of the ownership of, or assets owned by, any of the
Gollehon-controlled entities, the Court cannot determine whether and to what extent Gollehon
directly or indirectly owned an interest in any of his entities or their assets.  In the absence of
any documentation supporting the transfer of funds from one account to another, the Court
cannot determine Gollehon's material business transactions.  The Court finds it impossible to
determine Gollehon's true financial condition.  The Court will therefore enter judgment on this
count in favor of Florado, denying Gollehon's discharge under § 727(a)(3).

**C.**      **11 U.S.C. § 727(a)(4)(A)**

To prevail on its § 727(a)(4)(A) count, Florado must show by a preponderance of the
evidence that Gollehon "knowingly and fraudulently made an oath and that the oath relates to a
material fact."  *In re Brown*, 108 F.3d at 1294.  A "false oath" may be either: "(1) a false
statement or omission in the debtor's schedules or (2) a false statement by the debtor at an
examination during the course of the proceedings."  *U. S. Trustee v. Garland (In re Garland)*,
417 B.R. 805, 814 (10th Cir. BAP 2009) (citing 6–27 *Collier on Bankruptcy* ¶ 727.04[1][c]
(15th ed. rev. 2009)).

"A false oath caused by mere mistake or inadvertence is not sufficient to bar a debtor's
discharge.  Nor is an honest error or a mere inaccuracy.  However, 'reckless indifference to the
truth has consistently been treated as the functional equivalent of fraud for purposes of
§ 727(a)(4)(A).'"  *Cadle Co. v. King (In re King)*, 272 B.R. 281, 302 (Bankr. N.D. Okla. 2002)
(quoting *In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987), further quotation omitted).

Florado points to many inaccuracies on Gollehon's schedules, including his failure to list
any transfers made within two years of his petition date; his failure to schedule any debt owed to
the Romanians or to Summerlin Energy; his providing incorrect end dates on the corporate
entities listed and failure to list all of the entities he managed or controlled; and his failure to
disclose his control and use of funds in the Romanian Account as well as the Sugar Loaf,
WikiRainForest, and Summerlin Energy Accounts, and the assets of The Summerlin Trust.  The
Court finds that Gollehon's schedules and statement of financial affairs do not present a full and
accurate picture of Gollehon's financial affairs, and the Court finds that in preparing his
schedules, Gollehon acted with an intent that was, at a minimum, reckless indifference to the
truth.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

Further, the Court has reviewed the transcript of Gollehon's § 341 meeting[11] and finds that in several different aspects Gollehon omitted information so as to conceal the way he had been conducting his financial affairs before and after the filing of his bankruptcy petition. For example, at the beginning of the meeting, Gollehon volunteered the information that he had omitted a bank account for which he was a signer from the Trustee Information Sheet. Gollehon stated that the account, in the name of WikiRainForest, was opened on July 19, and on Gollehon's petition date the balance in the account was $4,310. Gollehon testified that the funds had come from business associates and from his two children, that the funds had all been spent on general business expenses, and that the account was subsequently closed and any remaining assets transferred to Open Source Gaming. Gollehon did not disclose that when he first opened the account on July 19, the initial deposit was over $12,000, of which $10,000 was immediately transferred to the Romanian Account from which Gollehon withdraw cash at ATMs and paid his and his family members' personal credit cards. Further, Gollehon did not disclose that immediately following his bankruptcy filing, he deposited a substantial additional amount, over $10,000 raised from investors other than his children, most of which was transferred to Kimberly Gollehon ($5,000) and to the Romanian Account ($3,000). While Gollehon's testimony regarding the account balance on his petition date was, itself, accurate, Gollehon's omission of the larger amounts of money paid in and transferred out was misleading.

In another example, the Trustee asked Gollehon to provide further detail about the income he had received during the last two years, listed on his Statement of Financial Affairs as $4,000 from consulting in the energy business and $20,000 from Gollehon's Father's Estate. Gollehon testified that he was paid $8,000 from Summerlin Energy as a management fee. The Summerlin Energy Account records do not show payment of an $8,000 management fee to Gollehon. The records show one check to Gollehon, for $2,000, which is marked "loan." His

---

[11] The transcript of Gollehon's § 341 meeting was included as Exhibit 11 in Florado's trial exhibits. The Court's Order and Notice of Trial (docket #139) provided: "Written objections directed to the exhibits must be filed and served on opposing counsel or party on or before August 26, 2013, otherwise all objections except as to relevancy are waived." Gollehon, through counsel, filed written objections to certain of Florado's exhibits (see docket #147) but did not object to Exhibit 11. Both parties referred to Gollehon's § 341 meeting testimony and the transcript contained in Exhibit 11 throughout their questioning of Gollehon, with no objection made. There is no question of authenticity of the transcript, as the original document was opened at trial, and the prior testimony of Gollehon himself is not hearsay. Fed. R. Evid. 801(d)(2)(A). Rule 32(a)(3) of the Federal Rules of Civil Procedure, incorporated herein by Fed. R. Bankr. P. 7032, specifically provides for the use of a party opponent's deposition "for any purpose." The Court therefore concludes that the § 341 transcript is admissible. The Court has considered Gollehon's § 341 testimony for impeachment purposes, for the purpose of showing Gollehon's state of mind, and for the substance of the false statements contained therein, and the transcript is deemed admitted.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

testimony that he was paid $8,000 as a management fee was false and misleading.  Gollehon
further testified that Summerlin Energy had only brokered one sale, and when the account was
closed in approximately September of 2010, it has a balance of only $50.00.  Gollehon did not
discuss the substantial transfers of funds into and out of the Summerlin Energy Account during
2009 and 2010, mainly to and from the Romanian Account, but also from The Summerlin Trust
and Sugar Loaf.  His omission of the transfers of thousands of dollars made in the year prior to
his bankruptcy filing, including cash deposits made in the month before Gollehon's bankruptcy
filing, was misleading.

        In a third example, the Trustee asked Gollehon about the home where he was living at
the time, which Gollehon testified was owned by Kimberly Gollehon.  The Trustee asked about
the mortgage on the home, which Gollehon testified was around $4,600 or $4,700 per month.
Gollehon testified that Kimberly Gollehon paid the mortgage each month, and that the mortgage
was then current.  The Trustee asked Gollehon how much money Kimberly Gollehon made from
her employment, and Gollehon testified that it was $5,000 per month, plus benefits.  The Trustee
asked how Kimberly Gollehon made $4,600 or $4,700 per month mortgage payments on a
$5,000 per month income, and Gollehon testified that she had built up savings "from years of
working" and that she had borrowed funds from a bank.  Gollehon did not provide any
information about the substantial funds transferred to Kimberly Gollehon from bank accounts
controlled by Gollehon, including a $20,000 check written to Kimberly Gollehon from the
Summerlin Energy Account, posting December 3, 2009, and two checks totaling $5,000 written
to Kimberly Gollehon from the WikiRainForest Account, posting in August of 2010, two
months prior to Gollehon's testimony at the § 341 meeting.  Gollehon's omission of this
information was misleading.

        The Trustee asked Gollehon about CI Colorado and CI Anguilla, which Gollehon
testified had no assets, no bank accounts, and were last operational in 2005.  Gollehon did not
provide additional information about his transactions with the Romanians, including the
Romanian Account into which he deposited checks made out to Cosmin Danila or Ionela
Boriceanu for "consulting" and from which he withdrew cash at ATMs and paid personal credit
card expenses for himself and his family members.  Gollehon's omission of this information was
misleading.

        There are other omissions throughout Gollehon's testimony, including his failure to state
that BransonWood/Sugar Loaf had been reinstated in order to cash a check from the IRS; his
statement that all funds from his Father's Estate were received in 2009 when in fact the last
payment was received in June of 2010; and his statement that the HSBC Account was closed
earlier than it was.

        It is significant that Gollehon's misleading testimony took place at his § 341 meeting, a
statutory obligation designed to obtain clarification of a debtor's financial picture.  As one court
has noted:

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

> Appearance at Section 341 meetings is important for debtors and is required
> under Section 343. The debtors are put under oath, and testimony is recorded.
> The meeting, for most debtors, is the only direct contact that the debtors will have
> with the trustee and with the bankruptcy system. The trustees request
> information [from the debtor] at the meeting for administration of the estate.
> While the 341 meeting may, in some very basic no-asset cases, admittedly be an
> event of small consequence, the meeting is an important tool for identifying
> possible factual matters and attendant legal issues that may indeed be of major
> significance to the debtor.

*In re Johnson*, 291 B.R. 462, 469 (Bankr. D. Minn. 2003). In this case, in which Gollehon
prepared his schedules and statement of financial affairs *pro se*, the § 341 meeting provided him
an opportunity to disclose the information he omitted from his schedules and statement of
financial affairs. Instead of clarifying his financial affairs, Gollehon furthered the misleading
picture presented on his schedules and statements of financial affairs by downplaying the
activities of his related entities and the amount of money flowing through them, to the point that
Gollehon's testimony, in several respects and as a whole, was materially misleading. Gollehon's
omissions were not mistakes, inadvertence, or honest errors. Instead, the Court finds that
Gollehon's omissions and misleading statements were intentionally made, in order to prevent the
Trustee from discovering the nature of Gollehon's financial affairs. At a minimum, the Court
finds that Gollehon acted with a reckless indifference to the truth of the testimony he provided,
which reckless indifference has been held to be equivalent of fraudulent intent. *In re King*, 272
B.R. at 302. The Court will therefore enter judgment on this count in favor of Florado, denying
Gollehon's discharge under § 727(a)(4)(A).

### D.      11 U.S.C. § 727(a)(5)

Section 727(a)(5) provides an exception to discharge for cases in which "the debtor has
failed to explain satisfactorily, before determination of denial of discharge under this paragraph,
any loss of assets or deficiency of assets to meet the debtor's liabilities[.]" Florado has the
burden of proving facts establishing that a loss or deficiency of assets actually occurred. Once it
meets this initial burden of proof, the burden shifts to Gollehon to explain the loss or deficiency
of his assets in a satisfactory manner. *Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 618
(10th Cir. BAP 2001), *aff'd*, 35 F. Appx 811 (10th Cir. 2002). This Court has previously
discussed the purpose behind § 727(a)(5), as follows:

> Under the provisions of § 727(a)(5), a debtor will not be granted a discharge
> where it appears to the court that the debtor should have had the resources
> available to deal fairly with creditors, but is unable to explain the disposition or
> loss of those assets. A lack of detailed information as to the debtor's affairs
> prejudices creditors by making it difficult for the trustee to administer the estate
> and recover assets that may otherwise be recoverable for the benefit of creditors.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

As well, a lack of transparency creates a cloud of doubt as to the true nature of the debtor's pre-petition activities. Where the ability to maintain records and explain the loss of assets is fully within the debtor's control, it would be inequitable to grant a discharge to an individual who, by his or her own actions, with or without fraudulent intent, has made it impossible to administer the estate or determine where the debtor's assets have gone.

*McVay v. Phouminh (In re Phouminh)*, 339 B.R. 231, 247 (Bankr. D. Colo. 2005).

Here, Gollehon transferred hundreds of thousands of dollars among various accounts he controlled, deliberately maintaining very few assets in his individual name. He lived in a house that he did not own. He drove a car that he did not own. On those occasions that he received funds in his individual capacity, he immediately transferred, by assignment or otherwise, those funds to the accounts of his entities or his friends or family members. For example, in August 2006, Gollehon earned an $840,000 real estate commission, but he had the title company send the funds to CI Anguilla. In November 2006, Gollehon earned a $296,000 commission, but he had the title company send most of the funds to CI Colorado. At the time of each transfer, Gollehon had been sued by both Fognani and Florado.[12] In 2009 and 2010, after the entry of judgments in Fognani's and Florado's favor, Gollehon received personal distributions from his Father's Estate, but instead of depositing the checks into his own account (during the time that he maintained an individual account), he endorsed the checks and deposited them into accounts in the names of other persons or entities. Both immediately prior to and immediately after the filing of his bankruptcy petition, Gollehon used the Romanian Account to withdraw cash at ATMs and to pay his and his family members' personal credit card bills. Gollehon assiduously avoided owning assets in his own name, to the extent of intentionally creating a deficiency of his assets to meet his liabilities. Florado has met its burden of proof in this regard.

Gollehon argues that his inability to pay his creditors is a result of his business failures, brought on by the collapse of the real estate market (for the real property investments in Colorado and Arkansas) and by the corruption of others in Mexico (for the investments in Grupo Summerlin). Had Gollehon maintained records showing legitimate business activity by the various entities, the Court might have found his argument more persuasive. But Gollehon's failure to maintain any records showing legitimate business activity followed by legitimate business loss is precisely the "lack of detailed information that prejudices creditors, making it

---

[12]  Gollehon testified that he had no non-ordinary-course creditors at the time, arguing that the amounts owed to Fognani and to Florado were subject to a bona fide dispute until such amounts were determined by a court of appropriate jurisdiction. The Court disagrees. The evidence before the Court does not support Gollehon's claim of a bona fide dispute. Further, Gollehon's schedules list other non-ordinary-course debts existing prior to August 2006, including a $390,000 debt to Robert Beisenherz, incurred in May 2006, which is not listed as contingent or disputed.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01298 HRT

difficult for the Trustee to administer the estate and recover assets that may otherwise be recoverable for the benefit of creditors" that this Court discussed in *Phouminh*.  339 B.R. at 247. And Gollehon's use of the Romanian Account and others to conceal the amount of money he was handling is the "lack of transparency [that] creates a cloud of doubt as to the true nature of the debtor's pre-petition activities."  *Id.*  Here, as in *Phouminh*, the Court finds that "the ability to maintain records and explain the loss of assets is fully within the debtor's control, [and] it would be inequitable to grant a discharge to an individual who, by his or her own actions, with or without fraudulent intent, has made it impossible to administer the estate or determine where the debtor's assets have gone."  The Court will therefore enter judgment on this count in favor of Florado, denying Gollehon's discharge under § 727(a)(5).

### E.    11 U.S.C. § 727(a)(6)

Florado's Complaint seeks denial of Gollehon's discharge for failure to comply with a court order, arguing that Gollehon did not comply with Florado's discovery subpoena.  Florado abandoned this issue at trial and did not address it in its closing argument.  The Court will deny all pending sanctions motions as moot and enter judgment on this count in favor of Gollehon.

### CONCLUSION

For the reasons discussed above, the Court will enter judgment in favor of Florado, denying Gollehon's discharge under 11 U.S.C. §§ 727(a)(2)(A), (a)(3), (a)(4)(A), and (a)(5). The Court will enter judgment in favor of Gollehon under 11 U.S.C. § 727(a)(6).

Dated this  25th  day of June, 2014.

BY THE COURT:

Howard R. Tallman, Chief Judge
United States Bankruptcy Court

Exhibit A

Summerlin Equities Account

04/25/08-11/03/08

| Date Posted | Deposit/Withdrawal | Amount | Method | From/To | Check signed by | Check memo |
|---|---|---|---|---|---|---|
| 04/25/08 | Deposit | $58,520.00 | Wire Transfer from | Smuggler Result | | |
| 04/02/08 | Withdrawal | ($1,334.30) | Electronic Payment | Time Insurance | | |
| 04/23/08 | Withdrawal | ($2,000.00) | Check #3658 to | Robert Tibbals | Kimberly Gollehon | |
| 04/30/08 | Withdrawal | ($5,000.00) | Check #3660 to | Ionela Boriceanu | Gollehon | Consulting |
| 05/01/08 | Withdrawal | ($19,779.00) | Check #3659 to | Boulder Motors LLC | Gollehon | |
| 05/02/08 | Withdrawal | ($1,334.30) | Electronic Payment to | Time Insurance | | |
| 05/13/08 | Withdrawal | ($2,000.00) | Check #3661 to | Robert Tibbals | Kimberly Gollehon | |
| 06/06/08 | Withdrawal | ($5,000.00) | Check #1161 to | Ionela Boriceanu | Gollehon | Consulting |
| 06/09/08 | Withdrawal | ($675.50) | Check #3662 to | North American Co. | Kimberly Gollehon | |
| 06/10/08 | Withdrawal | ($309.20) | Check #3663 to | Comcast | Kimberly Gollehon | |
| 06/18/08 | Withdrawal | ($2,000.00) | Check #3664 to | Robert Tibbals | Kimberly Gollehon | |
| 07/01/08 | Withdrawal | ($2,000.00) | Check #3665 to | Robert Tibbals | Gollehon | Consulting |
| 07/01/08 | Withdrawal | ($3,000.00) | Check #3666 to | Ionela Boriceanu | Gollehon | Contract Work |
| 07/09/08 | Withdrawal | ($244.60) | Check #3667 to | B&B Appliance | Gollehon | Contract Work |
| 07/02/08 | Withdrawal | ($500.00) | Check #3668 to | Kevin Gollehon | Gollehon | |
| 07/14/08 | Withdrawal | ($183.96) | Electronic Payment to | Time Insurance | | |
| 07/17/08 | Withdrawal | ($250.00) | Check #3669 to | Kevin Gollehon | Gollehon | Contract Work |
| 07/19/08 | Withdrawal | ($250.00) | Check #3670 to | Kevin Gollehon | Gollehon | Contract Work |
| 07/30/08 | Withdrawal | ($2,000.00) | Check #3671 to | Ionela Boriceanu | Gollehon | Consulting |
| 08/13/08 | Withdrawal | ($250.00) | Check #3672 to | HDX Global | Gollehon | Contract Labor |
| 08/18/08 | Withdrawal | ($4,090.00) | Check #3673 to | Robert Tibbals | Gollehon | |
| 08/22/08 | Withdrawal | ($2,000.00) | Check #3675 to | Robert Tibbals | Kimberly Gollehon | |
| 08/18/08 | Withdrawal | ($99.00) | Check #3676 to | 24 Hour Fitness | Kimberly Gollehon | |
| 08/21/08 | Withdrawal | ($2,000.00) | Check #3677 to | Ionela Boriceanu | Gollehon | Consulting |
| 09/10/08 | Withdrawal | ($222.59) | Electronic Payment to | Time Insurance | | |
| 09/10/08 | Withdrawal | ($2,000.00) | Check #3875 to | Ionela Boriceanu | Gollehon | Consulting |
| 10/10/08 | Withdrawal | ($2,000.00) | Check #3679 to | Robert Tibbals | Kimberly Gollehon | |
| 10/02/08 | Withdrawal | ($222.59) | Electronic Payment to | Time Insurance | | |
| 11/03/08 | Withdrawal | ($222.59) | Electronic Payment to | Time Insurance | | |

Exhibit B

Summerlin Energy Account

07/16/09 -08/19/10

| Date Posted | Deposit/Withdrawal | Amount | Method | From/To | Check signed by (written by) | Check/Deposit memo |
|---|---|---|---|---|---|---|
| 07/16/09 | Deposit | $21,666.57 | Check from | Mid Continent Energy | | Short Term Loan |
| 07/30/09 | Withdrawal | ($10,000.00) | Check #2001 to | Paul Zakovich | Gollehon | Loan |
| 08/19/09 | Deposit | $10,000.00 | Check from | Ionela Boriceanu | Ionela Boriceanu (Gollehon) | Loan |
| 08/14/09 | Withdrawal | ($3,000.00) | Check #2003 to | Elliot Gollehon | Gollehon | Loan |
| 09/11/09 | Deposit | $6,000.00 | Check from | Ionela Boriceanu | Ionela Boriceanu (Gollehon) | Loan |
| 10/15/09 | Withdrawal | ($2,000.00) | Check #2006 to | Gollehon | Gollehon | |
| 10/20/09 | Withdrawal | ($2,000.00) | Check #2007 to | Ionela Boriceanu | Gollehon | Consulting |
| 11/16/09 | Withdrawal | ($537.00) | Check #2009 to | Paul Zakovich | Gollehon | |
| 11/18/09 | Withdrawal | ($1,000.00) | Check #2011 to | Ionela Boriceanu | Gollehon | Consulting |
| 11/30/09 | Deposit | $74,000.00 | Wire transfer from | The Summerlin Trust | | |
| 12/02/09 | Withdrawal | ($2,500.00) | Check #2010 to | Royce Tolley | Gollehon | Consulting |
| 12/01/09 | Withdrawal | ($5,000.00) | Check #2012 to | Ionela Boriceanu | Gollehon | Consulting |
| 12/03/09 | Withdrawal | ($20,000.00) | Check #2014 to | Kimberly Gollehon | Gollehon | Loan |
| 12/08/09 | Withdrawal | ($3,000.00) | Check #2016 to | Ionela Boriceanu | Gollehon | Consulting |
| 12/21/09 | Withdrawal | ($3,000.00) | Check #2017 to | Ionela Boriceanu | Gollehon | Consulting |
| 01/08/10 | Withdrawal | ($563.00) | Check #2018 to | Paul Zakovich | Gollehon | Lodging |
| 01/08/10 | Withdrawal | ($439.89) | Check #2019 to | Pueblo Bonito Emerald Bay | Gollehon | |
| 01/12/10 | Withdrawal | ($313.62) | Check #2020 to | Comcast | Gollehon | |
| 01/12/10 | Withdrawal | ($3,500.00) | Check #2022 to | Norb Kmoch | Gollehon | Loan |
| 01/15/10 | Withdrawal | ($1,000.00) | Check #2023 to | Gene Upshaw | Gollehon | Loan |
| 01/25/10 | Withdrawal | ($3,000.00) | Check #2024 to | Ionela Boriceanu | Gollehon | Consulting |
| 02/16/10 | Withdrawal | ($4,000.00) | Check #2025 to | Cosmin Danila | Gollehon | Consulting |
| 03/17/10 | Withdrawal | ($294.96) | Check #2027 to | Columbine Country Club | | |
| 03/24/10 | Withdrawal | ($4,000.00) | Check #2028 to | Cosmin Danila | Gollehon | Consulting |
| 04/01/10 | Withdrawal | ($300.00) | Cash withdrawal by | Gollehon | | |
| 04/16/10 | Withdrawal | ($2,000.00) | Check #2030 to | Cosmin Danila | Gollehon | Consulting |
| 05/13/10 | Deposit | $6,500.00 | Check from | Sugar Loaf Account | Gollehon | Loan |
| 05/13/10 | Withdrawal | ($5,000.00) | Check #2032 to | Cosmin Danila | Elliot Gollehon (Gollehon) | Consulting |
| 07/16/10 | Deposit | $500.00 | Check from | Sugar Loaf Account | Gollehon | Loan |
| 07/12/10 | Withdrawal | ($1,500.00) | Check #2039 to | Ionela Boriceanu | Elliot Gollehon (Gollehon) | Consulting |
| 07/16/10 | Withdrawal | ($1,000.00) | Check #2040 to | Cosmin Danila | Elliot Gollehon (Gollehon) | Consulting |
| 07/22/10 | Withdrawal | ($250.00) | Check #2041 to | The Summerlin Trust | Elliot Gollehon (Gollehon) | Interest Payment on Loan |
| 08/02/10 | Deposit | $562.15 | Check from | Sugar Loaf Account | Gollehon | Loan |
| 08/05/10 | Deposit | $500.00 | Cash from | Romanian Account/ATM | | |
| 08/09/10 | Deposit | $500.00 | Cash from | Romanian Account/ATM | | from Summerlin Trust |
| 08/11/10 | Deposit | $500.00 | Cash from | Romanian Account/ATM | | from Summerlin Trust |
| 08/19/10 | Deposit | $500.00 | Cash from | Romanian Account/ATM | | Summerlin Trust |

Exhibit C

Romanian Account

01/15/09-09/15/10

| Date | Deposit/Withdrawal | Amount | Method | From/To | Check signed by (written by) | Check/Deposit memo |
|---|---|---|---|---|---|---|
| 01/15/09 | Deposit | $1,500.00 | Check from | Gollehon (individual account) | Kimberly Gollehon | |
| 01/16/09 to 02/13/09 | Withdrawal | ($733.59) | ATMs in Mazatlan, Mexico | | | |
| 01/16/09 to 02/13/09 | Withdrawal | ($2,355.98) | Online payments | Various credit card companies | | |
| 01/28/09 | Deposit | $1,250.00 | Check from | Gollehon (individual account) | Kimberly Gollehon | |
| 02/23/09 | Withdrawal | ($208.55) | ATMs in Mazatlan, Mexico | | | |
| 02/14/09 to 03/13/09 | Withdrawal | ($3,125.00) | Online payments | Various credit card companies | | |
| 02/19/09 | Deposit | $1,500.00 | Check from | Gollehon (individual account) | Kimberly Gollehon | |
| 02/26/09 | Deposit | $600.00 | Check from | Gollehon (individual account) | Kimberly Gollehon | |
| 03/02/09 | Deposit | $800.00 | Check from | Gollehon (individual account) | Kimberly Gollehon | |
| 03/23/09 | Deposit | $3,498.00 | Wire transfer from | Grupo Summerlin (HSBC) | | |
| 03/26/09 | Deposit | $1,500.00 | Check from | Gollehon (individual account) | Kimberly Gollehon | Repay loan |
| 04/02/09 | Deposit | $14,980.00 | Wire transfer from | Grupo Summerlin (HSBC) | | |
| 03/14/09 to 04/04/09 | Withdrawal | ($5,176.00) | Online payments | Various credit card companies | | |
| 04/15/09 to 05/14/09 | Withdrawal | ($1,600.00) | ATMs in Littleton, Colorado | | | |
| 04/15/09 to 05/14/09 | Withdrawal | ($3,924.00) | Online payments | Various credit card companies | | |
| 06/03/09 | Deposit | $600.00 | Check from | Gollehon's Father's Estate | endorsed by Gollehon | May & June exp |
| 06/11/09 | Deposit | $500.00 | Check from | High Country Speaking, LLC | | |
| 05/15/09 to 06/12/09 | Withdrawal | ($3,434.00) | Online payments | Various credit card companies | | |
| 07/06/09 | Deposit | $600.00 | Check from | Gollehon's Father's Estate | endorsed by Gollehon | |
| 07/07/09 | Deposit | $19,985.00 | Wire transfer from | Grupo Summerlin (HSBC) | | |
| 06/23/09 | Withdrawal | ($400.00) | ATMs in Littleton, Colorado | | | |
| 06/13/09 to 07/14/09 | Withdrawal | ($4,985.00) | Online payments | Various credit card companies | | |
| 07/15/09 | Deposit | $7,280.00 | Check to | Elliot Gollehon | Ionela Boriceanu (Elliot Gollehon) | Loan |
| 07/15/09 to 08/14/09 | Withdrawal | ($750.76) | ATMs in Edmonton, Alberta | | | |
| 07/15/09 to 08/14/09 | Withdrawal | ($9,504.00) | Online payments | Various credit card companies | | |
| 08/18/09 | Deposit | $4,981.20 | Wire transfer from | Grupo Summerlin (HSBC) | | |
| 08/25/09 | Deposit | $6,983.20 | Wire transfer from | Grupo Summerlin (HSBC) | | |
| 09/15/09 | Deposit | $1,000.00 | Check to | Kimberly Gollehon | Kimberly Gollehon | Loan |
| 09/11/09 | Deposit | $6,000.00 | Check to | Summerlin Energy | Ionela Boriceanu (Gollehon) | Loan |
| 08/15/09 to 09/15/09 | Withdrawal | ($4,556.00) | Online payments | Various credit card companies | | |
| 09/29/09 | Deposit | $3,000.00 | Check from | Kimberly Gollehon | Kimberly Gollehon | |
| 09/29/09 | Withdrawal | ($400.00) | ATMs in Littleton, Colorado | | | |
| 09/16/09 to 10/15/09 | Withdrawal | ($4,410.00) | Online payments | Various credit card companies | | |
| 10/20/09 | Deposit | $2,000.00 | Check from | Summerlin Energy | Gollehon | Consulting |
| 11/03/09 | Deposit | $600.00 | Check from | Gollehon's Father's Estate | endorsed by Gollehon | |
| 10/16/09 to 11/15/09 | Withdrawal | ($400.00) | ATMs in Littleton, Colorado | | | |
| 10/16/09 to 11/15/09 | Withdrawal | ($2,818.00) | Online payments | Various credit card companies | | |
| 11/18/09 | Deposit | $1,000.00 | Check from | Summerlin Energy | Gollehon | Consulting |
| 11/25/09 | Deposit | $2,000.00 | Check from | Kimberly Gollehon | Kimberly Gollehon | Loan |
| 12/01/09 | Deposit | $5,000.00 | Check from | Summerlin Energy | Gollehon | Consulting |
| 12/08/09 | Deposit | $3,000.00 | Check from | Summerlin Energy | Gollehon | Consulting |
| 11/17/09 to 12/14/09 | Withdrawal | ($1,200.00) | ATMs in Littleton, Colorado | | | |
| 11/17/09 to 12/14/09 | Withdrawal | ($7,091.00) | Online payments | Various credit card companies | | |
| 12/21/09 | Deposit | $3,000.00 | Check from | Summerlin Energy | Gollehon | Consulting |
| 12/15/09 to 01/15/10 | Withdrawal | ($400.00) | ATMs in Littleton, Colorado | | | |
| 12/15/09 to 01/15/10 | Withdrawal | ($4,131.00) | Online payments | Various credit card companies | | |
| 01/25/10 | Deposit | $3,000.00 | Check from | Summerlin Energy | Gollehon | Consulting |
| 01/16/10 to 02/12/10 | Withdrawal | ($503.00) | ATM in Las Vegas, Nevada | | | |

Page 1 of 2

Exhibit C

Romanian Account

01/15/09-09/15/10

| Date | Type | Amount | Transaction | Romanian Account | Endorsement | Note |
|---|---|---|---|---|---|---|
| 01/16/10 to 02/12/10 | Withdrawal | ($4,037.00) | Online payments | Various credit card companies | | |
| 02/16/10 | Deposit | $4,000.00 | Check from | Summerlin Energy | Gollehon | Consulting |
| 03/11/10 | Deposit | $2,500.00 | Check from | Gollehon (individual account) | Gollehon | Repay loan |
| 02/13/10 to 03/12/10 | Withdrawal | ($4,282.00) | Online payments | Various credit card companies | | |
| 03/24/10 | Deposit | $4,000.00 | Check from | Summerlin Energy | Gollehon | Consulting |
| 03/13/10 to 04/14/10 | Withdrawal | ($303.95) | ATM in Black Hawk, CO | | | |
| 03/13/10 to 04/14/10 | Withdrawal | ($4,637.00) | Online payments | Various credit card companies | | |
| 04/16/10 | Deposit | $2,000.00 | Check from | Summerlin Energy | Gollehon | Consulting |
| 05/04/10 | Deposit | $1,000.00 | Cash deposit | | | |
| 05/04/10 | Deposit | $1,500.00 | Check from | Sue Hendren, written to Norb Kmoch | endorsed to, and by, Gollehon | |
| 05/13/10 | Deposit | $5,000.00 | Check from | Summerlin Energy | Elliot Gollehon (Gollehon) | Consulting |
| 04/15/10 to 05/14/10 | Withdrawal | ($3,930.00) | Online payments | Various credit card companies | | |
| 05/15/10 to 06/14/10 | Withdrawal | ($3,453.00) | Online payments | Various credit card companies | | |
| 06/23/10 | Deposit | $1,777.43 | Check from | Gollehon's Father's Estate | endorsed by Gollehon | Final distribution |
| 07/12/10 | Deposit | $1,500.00 | Check from | Summerlin Energy | Elliot Gollehon (Gollehon) | Consulting |
| 07/12/10 | Withdrawal | ($300.00) | ATMs in Littleton, Colorado | | | |
| 06/15/10 to 07/15/10 | Withdrawal | ($5,358.05) | Online payments | Various credit card companies | | |
| 07/16/10 | Deposit | $1,000.00 | Check from | Summerlin Energy | Elliot Gollehon (Gollehon) | Consulting |
| 07/22/10 | Deposit | $10,000.00 | Check from | WikiRainForest | Gollehon | |
| 07/26/10 | Withdrawal | ($3,000.00) | Check to | WikiRainForest | Ionela Boriceanu (Gollehon) | 1 Founder Unit |
| 08/02/10 | Withdrawal | ($2,000.00) | Check to | [copy of check not included] | | |
| 07/16/10 to 08/13/10 | Withdrawal | ($3,200.00) | ATMs in Littleton, Colorado | | | |
| 07/16/10 to 08/13/10 | Withdrawal | ($1,477.00) | Online payments | Various credit card companies | | |
| 08/16/10 | Deposit | $2,000.00 | Check from | Kimberly Gollehon | Kimberly Gollehon | int |
| 08/16/10 | Deposit | $3,000.00 | Check from | WikiRainForest | Gollehon | Consulting |
| 08/14/10 to 09/15/10 | Withdrawal | ($2,300.00) | ATMs in Littleton, Colorado | | | |
| 08/14/10 to 09/15/10 | Withdrawal | ($3,778.58) | Online payments | Various credit card companies | | |